THE PEOPLE OF THE STATE OF NEW YORK ex rel. CHARLES SHERMAN, Relator, *v.* ——————— BARR, Respondent.

Supreme Court, New York County, April 30, 1928.

**Crimes — extradition proceedings — relator was arrested in New York State for crime of murder alleged to have been committed in Boston — proof shows beyond doubt that relator was not within State of Massachusetts when crime was committed — writ of habeas corpus sustained and relator discharged.**

Relator, against whom has been issued a warrant directing his rendition to the State of Massachusetts for the crime of murder alleged to have been committed in Boston, must be discharged on this writ of habeas corpus, where the proof indicates beyond a doubt that the relator was not within the State of Massachusetts when the crime was committed.

HABEAS CORPUS proceeding for release of relator who has been delivered to the State of Massachusetts on a charge of murder.

*J. Arthur Adler*, for the relator.

*Joab H. Banton* [*Edward V. Loughlin* of counsel], for the respondent.

SHERMAN, J.   On Friday, February 10, 1928, at about the hour of eleven P. M., one Tucker, while walking on Tremont street, in the city of Boston, was atrociously murdered.   His assailant sprang from an automobile and fired five shots into Tucker's body before

Tucker, who was likewise armed, could defend himself. Tucker died within a few hours. On March 4, 1928, Charles Sherman, the relator, was arrested in the city of New York as the perpetrator of that crime. Upon the application of the Governor of Massachusetts the Governor of this State issued a warrant directing his rendition to the Massachusetts authorities. Sherman thereupon obtained a writ of habeas corpus in this court. Considerable testimony has been taken upon his claim that he was not within the State of Massachusetts, at or about the time that the murder was committed. The following questions arise upon this proceeding: Whether or not a crime was committed within the State of Massachusetts; whether or not the relator has been charged by the State of Massachusetts with the guilt of that crime; and whether or not the relator was within that State at or about the time of the commission of the crime. It is conceded that the crime of murder was actually committed and that the defendant is the individual who stands charged by the Commonwealth of Massachusetts with its commission. The relator has introduced proof which establishes that he was in the city of New York on or about the eighth day of February and arrived at Detroit, Mich., on February 9, 1928. His purpose in going to Detroit, as expressed to several witnesses, was to attend the funeral of one John Ryan. Uncontradicted proof has been presented that Ryan was buried at Detroit on the morning of February ninth. Indeed Senator Hanley's affidavit, which was received with the assent of the district attorney in lieu of his testimony, states that he was a pallbearer at Ryan's funeral at Detroit and saw the relator at the funeral on the morning of February ninth. The proprietor of the Hotel Griswold at Detroit attended as a witness and brought with him the register of that hotel, which contains the signature of the relator and shows that he registered on that day at that hotel. His name appears toward the end of the guests registered as arriving on that day, which, it is claimed, indicates that in all probability he registered at a late hour. One of the clerks of the hotel (Root) testified that he had every night since October, 1927, acted as night clerk at that hotel, his service commencing about eleven-forty-five P. M. and continuing well into the morning of the following day. He has positively identified the relator as the person who registered in his presence about midnight on February ninth and has also pointed out marks upon the register then made by the witness, showing that the witness was the one who assigned relator to the room which he thereafter occupied. Root likewise narrated conversations with the relator, identified the relator's traveling bag, which was of unusual size and weight, and has con-

vinced me that the relator was actually in Detroit at this hotel late on the night of February ninth. He also gave convincing testimony that the relator again spoke with him at that hotel late on the night of February tenth. The presence of the relator in Detroit is substantiated by other witnesses who saw him there on February ninth and likewise on February tenth and thereafter. He appears to have been a guest at the hotel for a period of about two weeks. Timetables of railroads have been introduced which show that the fastest running time of any train between Detroit and Boston is more than seventeen hours. This fast train had left on the night of February ninth several hours before the relator registered at the Hotel Griswold. The train schedules show that if relator was at the Hotel Griswold at or after midnight on February ninth he could not have reached Boston prior to the murder. Against this formidable proof the district attorney has presented an eyewitness of the murder (White), who testified to the killing of Tucker, which he witnessed while walking on Tremont street, a short distance behind Tucker. He saw Tucker's assailant jump from the automobile, fire the five shots from a revolver and then instantly turn and run in a direction opposite to the witness around the corner of the next street and disappear. This was done very quickly, and his view of the murderer was necessarily momentary. On February sixteenth White was interrogated by an inspector of the Boston police department, to whom he described the shooting. This questioning was taken stenographically, transcribed, and the minutes have been introduced in evidence before me. White then stated that he was " too scared to move at first," and when asked to give the best description of the murderer that he could said that the assailant was about five feet ten inches in height and weighed at least 190 pounds, that he was dressed in a blue double-breasted overcoat and wore a light soft hat, adding, " I didn't get a very good look at his face because he had his hat sort of pulled forward down over his eyes." He was unable to state whether or not this individual was of Jewish or Italian extraction because, as he said, " I was excited at the time being." When examined before me he stated that the assailant did not have the brim of his hat turned down at all and added that his overcoat collar was turned up and that he did not observe whether he wore gloves. The scene of the shooting was not very brightly lighted. The relator does not answer to the description which White thus gave to the inspector, for he is a slender youth, about five feet six inches in height and weighing about 130 pounds. If the assailant, under the conditions of light which were then present, had, as White first stated, worn his hat brim pulled down, White

Supreme Court, April, 1928.                    [Vol. 131

would have had but very little opportunity to see his features and form an impression as to what manner of man he was. White had never seen either the murdered man or his assailant before that night. After relator's arrest White was brought to New York city by the Boston authorities to identify Sherman and saw him on March seventh in the Police Court in New York city for the first time after the murder. At that time the prisoner was not placed in the customary line-up for an identification test, but he entered the court room in the custody of a keeper of the prison, and was then recognized by White as the murderer. This departure from the usual practice robs the identification of the probative value which it would ordinarily have. In the face of the overwhelming evidence which shows that the relator was at Detroit when the crime was committed, the identification of him as the murderer by White in the Police Court under such circumstances is of little or no value. I am convinced that the relator was not within the State of Massachusetts at the time of the commission of the offense charged. Of the other witnesses called by the district attorney, only one gave testimony which bore upon relator's presence in Boston. Tucker, a brother of the deceased, testified that he saw relator in Boston during the afternoon of February eighth, stating that he was walking on a street in Boston when an automobile drew up alongside the curb and relator looked out at him from the car and then the automobile immediately proceeded. This was the only occasion upon which this witness saw relator since both were in the city of New York ten years prior thereto. In view of the relator's youth, he must have been a mere boy ten years ago. This testimony on its face was unconvincing. Tucker admitted that he had been convicted of highway robbery and also of carrying a revolver without a permit, and his manner of testifying was such that I can give no credence to his testimony, which is furthermore contradicted by at least two witnesses who saw the relator in New York city on that day and is not to be reconciled with relator's presence in Detroit on February ninth. Upon this proof the duty of the court is clear. As stated in *People ex rel. Gottschalk* v. *Brown* (237 N. Y. 483, 486), where rendition was sought to the State of Ohio: " It is open to the relator to show by conclusive evidence that he was not in Ohio at the time the crime was, if ever, committed. (*Hyatt* v. *People ex rel. Corkran*, 188 U. S. 691; *People ex rel. Corkran* v. *Hyatt*, 172 N. Y. 176.) " Evidence becomes conclusive when it establishes beyond doubt the existence of the fact in issue, as in the case at bar. Here the contradictory evidence is so slight and uncertain as to amount hardly to a scintilla of proof. In *People ex rel. Genna* v. *McLaughlin* (145 App. Div. 513) relator

was charged with the crime of murder committed in the State of Illinois, and the Governor of this State had issued a warrant of extradition, whereupon he was brought before the Supreme Court upon a writ of habeas corpus. The Appellate Division in an opinion by Mr. Justice CARR, in which is found a careful and discriminating review of the authorities, reversed the Special Term which had dismissed the writ and remitted it for determination of the question whether the prisoner was actually a fugitive from justice from the State of Illinois. The Special Term had indicated in its opinion that the prisoner on the whole case before it had made out by a preponderance of evidence a complete and satisfactory alibi. It said: " As a matter of evidence the weight appears to be with the relator; in fact I am convinced that he was not in Illinois at the time the crime is said to have been committed, and that we are in the presence of a case where the proof of an alibi is complete and satisfactory." Nevertheless " it felt itself bound to ignore this ' complete and satisfactory ' proof of an alibi because, as it declared, an alibi is a matter of defense at the trial and cannot be used to defeat extradition." Mr. Justice CARR, speaking for the Appellate Division, after referring to the view of the Special Term, stated (p. 521): " Nor does there appear any controlling reason why this concededly jurisdictional fact should be subject to any other rule as to its proof than that which controls the determination of all other questions of fact at common law. In order that a fact may be determined conclusively in any judicial proceeding, it is not necessary that the proofs should be without any conflict. Nor does proof fall short of being conclusive simply because there is other proof to the contrary." The evidence in this case proves to my mind beyond doubt that the relator was not within the demanding State when the crime was committed. The writ is, therefore, sustained and the relator discharged.